IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

**TYRAN DOBBS**                             *

        *Plaintiff*                  *

v.                                    *

**THOMAS TOWNSEND, et al.**        *

        *Defendants*          *      Civil Action No.: 1:18-CV-339-RDB

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT</u>

NOW COMES Plaintiff Tyran Dobbs, by and through his undersigned counsel, Anton Iamele and IAMELE & IAMELE, LLP, who hereby opposes Defendant's Motion for Summary Judgment. Plaintiff Dobbs maintains that the factual record in this case, and the presumptions that can reasonably be drawn therefrom, preclude any dispositive ruling in favor of Defendants Thomas Townsend, Michael Pickett, and James Tippett.[1] Plaintiff asserts that these Defendants unlawfully arrested him and subjected him to deadly force at a time when they knew or reasonably should have known that (1) he had not engaged in any criminal activity and (2) he did not pose a threat to himself, police personnel or any third persons on the scene. There are also disputes of fact in this case regarding Mr. Dobb's conduct at the time of the subject occurrence and identified as justification for the use of force. Finally, the contours of the Plaintiff's rights

---

[1] Plaintiff initiated his action with an understanding that PFC Brian Reger had physically participated in his arrest. During the course of discovery, however, he learned that this belief was incorrect. Plaintiff does not oppose the portion of Defendants' motion concerning PFC Brian Reger <u>only</u>, and concedes that he should not be a party defendant in this action.

which were violated in the subject occurrence were sufficiently clear to the Defendants that there can be no claim of qualified immunity in this case.

Plaintiff states further Tyran Dobbs states further:

## TABLE OF CONTENTS

I.   Additional factual background ........................................................................................... 3

    A.   Howard County Police knew or reasonably should have known that they were not responding to a hostage situation before the use of force at issue in this case. .......................... 3

    B.   Plaintiff Tyran Dobbs fully cooperated with the responding officers and was in the process of voluntarily exiting the apartment when he was struck by the L6 rounds. ............... 11

    C.   The use of the L6 in this case was contrary to Howard County Police training and protocols, and was simultaneously an unreasonable application of deadly force against an unarmed and non-resistive subject. .......................................................................................... 14

        1.   The L6 and its permitted use. ................................................................................... 14

        2.   Officers Townsend and Pickett predetermined that the L6 would be fired at Plaintiff Dobbs when he was not actively resisting nor acting in an overtly aggressive manner. ....... 17

    D.   Whether Plaintiff Dobbs was attempting to reenter the apartment or actively resisting police commands is a matter of disputed fact. ........................................................................ 21

    E.   Even that Officer Pickett's use of the L6 was warranted, arguendo, the manner in which it was aimed was unnecessary and unlawful. ........................................................................... 23

II.  Argument ........................................................................................................................ 24

    A.   Summary Judgment Standard ........................................................................................ 24

    B.   Excessive Force ............................................................................................................. 24

    C.   Qualified Immunity ....................................................................................................... 30

    D.   State Common Law Claims ........................................................................................... 34

    III.  Conclusion ..................................................................................................................... 35

## LIST OF ATTACHED EXHIBITS

Exhibit No. 1        Incident Report Authored by Officer Pugliese

Exhibit No. 2        Deposition of Sergeant Thomas J. Townsend

Exhibit No. 3        Deposition of Lieutenant Jason Baker

Exhibit No. 4        Deposition of Joshua Mouton

Exhibit No. 5        Deposition of Jennifer Reidy-Hall

Exhibit No. 6        Deposition of James Tippett

Exhibit No. 7        Deposition of Brian Reger

Exhibit No. 8        Deposition of Michael Pickett

Exhibit No. 9        Photograph of Pickett's Location

Exhibit No. 10       Photograph of Rear Sliding Door

Exhibit No. 11       Radio Communications

Exhibit No. 12       Deposition of Rodshell Ballew

Exhibit No. 13       Deposition of Thomas Dobbs

Exhibit No. 14       Handwritten Notes by Lieutenant Jason Baker

Exhibit No. 15       CAD Reports

Exhibit No. 16       Deposition of Tyran Dobbs

Exhibit No. 17       Tyran Dobb's Answers to Interrogatories

Exhibit No. 18       DFC Garroway's Report

Exhibit No. 19       Deposition of Sean Garroway

Exhibit No. 20       Transcript of Investigation

Exhibit No. 21       Use of Force Report Authored by Michael Pickett

Exhibit No. 22       Deposition of Brian Reger dated September 7, 2018

Exhibit No. 23       Photographs Depicting Tyran Dobbs' Injuries

Exhibit No. 24       University of Maryland Medical Center Discharge Report

Exhibit No. 225      Howard County Fire Department Records

## I.  <u>ADDITIONAL FACTUAL BACKGROUND</u>

**A.  Howard County Police knew or reasonably should have known that they were not responding to a hostage situation before the use of force at issue in this case.**

This case concerns a police encounter that occurred at the Town and Country Apartment Building in Ellicott City, Maryland on February 18, 2015. That day, at 4:12p.m., Howard County Police dispatch "advised that a subject with a British accent had contacted MCAC and stated that he had three hostages." (Exhibit No. 1, Incident Report authored by Officer Pugliese) The dispatcher further indicated that the caller reported his possession of a "loaded gun" and "several bags of plastic explosives; "demanded $15,000 in cash be delivered in a red bag to 9107 Town and Country Blvd Apt. B"; and stated that "when the money is delivered he will drop the hostages off in three separate states" or alternatively "he would start executing the hostages at [4:15 pm]." (Exhibit No. 1) This initial call was received from a "partial" Las Vegas telephone number. (*Id.*) Patrol Officers immediately responded to the scene and established a perimeter around the apartment building.

Howard County tactical/SWAT officers were called out to the scene at 5:00 p.m. (Exhibit No. 2, Deposition of Thomas J. Townsend, p. 67) Sergeant Ronald Jason Baker had supervision responsibility for the deployed tactical teams. (Exhibit No. 3, Deposition of Lieutenant Jason Baker, pp. 6-7) When he arrived at the scene of the subject encounter, he and the responding Howard County police captain had "a conversation in the command post that [the call to Mr. Dobbs apartment] could possibly be a swatting call or something of that nature." (Exhibit No. 3, pp. 65-66). He explained that "it was from early on we had had – started having those conversations" based on concerns stemming from "the way the initial call came in"; the "fact that the telephone number was incomplete"; the caller's impossible demand that he paid the sum of $15,000.00 by 4:15 pm; and the callers indication that upon payment he would drop the hostages off in three separate states. (Exhibit No. 3, pp. 65-68)

Staging officers were advised of "a possibility of explosives" and "probably three hostages" inside of the apartment. (Exhibit No. 4, Deposition of Joshua Mouton, p. 17) Lieutenant Jennifer Reidy-Hall, leader of the responding negotiation team, recalls being advised that they "were responding for a possible hostage situation, and [she] remember[s] there being some mention of some sort of bomb." (Exhibit No. 5, Deposition of Jennifer Reidy-Hall, pp. 13-16). The responding officers were advised that a male subject (Tyran Dobbs) was the potential hostage taker and two females (Rodshell Ballew and Amelia Louise Friedman) and young child (T.B.) were the potential hostages. (Exhibit No. 5, pp. 29-30; Exhibit No. 1, Incident Report authored by Officer Pugliese)

Responding officers had lingering concerns regarding the legitimacy of the call. Officer Joshua Mouton, the primary negotiator, testified that when he took his position in the NOC, negotiators "in the van" separately discussed the possibility that the call might be a swatting incident. (Exhibit No. 4, pp. 57-58)

Sergeant Townsend, Sergeant Baker, and Corporal Jacobs coordinated to the determine "which team members [were] going to go to which locations." (Exhibit No. 2, pp. 19-23) Sergeant Townsend explained the operational hierarchy:

> [Each] team leader … would be in charge of the team and which location they're at on the perimeter or around the structure. Sergeant Baker would have stayed at the command post. Information would be relayed to him, and they would disseminate that through command level that's there and to the negotiators. Vice versa, negotiators would pass information to Sergeant Baker, who would then pass it over to team leaders.

(Exhibit No. 2, pp. 20-21) When negotiations were "going on, they would pass information of how the negotiations were going on to [the deployed tactical teams]." (Exhibit No. 2, pp. 23-24) Information was relayed between the teams over designated radio channels, by text messaging, and calls on "departmental cellphone[s]."  (Exhibit No. 2, pp. 27-29)

Sergeant Townsend and his tactical team of Officers Pickett, Reger, Tippett and Ream subsequently drove to the rear of the apartment complex in a "Bearcat", which is "an armored vehicle that sits on a Ford F-550 chassis." (Exhibit No. 6, Deposition of James Tippett, pp. 45-46; Exhibit No. 7, Deposition of Brian Reger, pp. 10-12; Exhibit No. 2, p. 35) In addition to armor plating the Bearcat was fitted with "bullet-resistant" ballistics glass. (Exhibit No. 8, Deposition Officer Michael Pickett, p. 35) Four spotlights, and armored turret and a "boom system to breach doors, breach windows, [or] deploy phones, if needed…" were mounted on top of the vehicle. (Exhibit No. 2, pp. 39-40)

A transcript of radio transmissions prepared by the Howard County Police Department, indicates that the Bearcat was in place behind the apartment complex at 5:56 pm. (Exhibit No. 2, p. 81) The team positioned the vehicle approximately 30 feet from the apartment. (Exhibit No. 6, Deposition of James Tippett, pp 45-46; See also Exhibit No. 7, p. 14 ("approximately 30 to 40 feet" between Bearcat and the Apartment.)) The relative position of the armored vehicle and the point where officer Pickett eventually fired upon Plaintiff Dobbs are shown in an investigative photograph that has been appended to this Opposition as Exhibit Number 9. The spotlights were trained on the sliding glass door at the rear of the apartment. (Exhibit No. 2, pp. 86-87)

In addition to the vehicles armor, Townsend, Pickett, Reger Pickett and Ream were further protected by a ballistic vest with "a rifle rated plate, helmets, [and] headgear". (Exhibit No. 2, p. 33) They each carried night vision goggles, a pistol, and rifle fitted with a laser sighting system. (Exhibit No. 2, pp. 33, 35)

Sergeant Townsend maintained surveillance of the Dobbs apartment from its "front passenger's seat" of the Bearcat. (Exhibit No. 2, pp. 76-77. His view into the apartment was limited by "Venetian blinds" hanging at the rear sliding glass door that were "60 percent closed."

(Exhibit No. 2, pp. 81-86; Exhibit 10, photographs depicting rear slider). Officers Pickett, Tipett, and Reger stationed themselves "right next to the Bearcat" on the passenger side in close enough proximity with one another to have "direct verbal communication." (Exhibit No. 7, pp. 14, 18) The tactical team responding to the back of the apartment building was supported by Howard County Police Officers Garroway and Cerrone, who were both counter-snipers. (Exhibit No. 7, pp. 16-17)

As mentioned in Defendants Motion for Summary Judgment, at approximately 6:00 pm, Sergeant Townsend perceived movement inside of the apartment that he initially attributed to Plaintiff Dobbs even though he "just can't say who it [was]." (Exhibit No. 2, p. 98) This promoted Townsend's 6:05 pm radio transmission that has been transcribed as follows:

> Hey Doug just so you are aware the subject is moving around quite a bit inside, crawling around on the floor, just jumped up ran across the front of the slider going from our right to our left in the apartment, came back across slider now. This little girl just sat down on a chair and appears to be playing an Ipad now.

(Exhibit No. 11, Radio Communications compiled and transcribed by Howard County Police). Sergeant Townsend explained at deposition, however, that the movement ended "up actually being is that it was the little girl ended up running, and then sitting down in a chair. That's what I ended up believing the – well, the movement ended up being." (Exhibit No. 2, pp. 101-102) Sergeant Townsend has conceded that he recognized his misperception by 6:07 pm on the day of the subject occurrence, forty minutes prior to the subject use of force. (Exhibit No. 2, pp. 105-106; See also Exhibit No. 8, p. 49 (never personally observed the reported "low crawling" in the apartment))

There was no other visible evidence suggesting that there was an ongoing hostage situation within the apartment. (Exhibit No. 2, pp. 102-104) From his vantage point near the Bearcat, Officer Tippett observed the same female child, sitting on the couch watching television

7

or playing on an iPad as well as an adult female. (Exhibit No. 6, pp. 51-55) They "did not appear to be hostages or being held against their will." (Exhibit No. 6, pp. 54, 58) Officer Tippett has explained that

> …. looking at them they didn't – again, as I stated, they didn't appear in distress so we all started talking. That's when the group discussion start coming up. Like all right, this is odd. They don't appear to be being held hostage, but obviously, we don't know. We want to make contact with them. Eliminate them from the residence. Bring them to us and get more intel.

(Exhibit No. 6, pp. 54-56)

At 6:14 pm, Sergeant Townsend asked command whether he should try to "call this girl out to us", and he was directed to wait for negotiators, who had "a cell phone number for the older" female. (Exhibit No. 11) He advised the tactical team at the Bearcat that negotiators would attempt contact. (Exhibit No. 6, p. 56) Rodshell Ballew was present in the apartment with her daughter T.B. when she received a call from the negotiation team and was asked to exit through the rear slider. (Exhibit No. 12, Deposition of Rodshell Ballew, pp. 24-25). This call prompted Ms. Ballew to walk from her bedroom to the living room of the apartment where all she could see "was a big, bright light." (Exhibit No. 12, p. 25) At the time she was still on the phone with police negotiators who asked, "Is that you walking?" (*Id.*) She responded in the affirmative, summoned her daughter and exited the apartment through the rear sliding door. (Exhibit No. 12, pp. 25-27) At 6:23 pm, Sergeant Townsend made the following radio transmission: "Looks like #1 female putting on coat and coming out." (Exhibit No. 11)

According to the negotiation team, Rodshell Ballew and her daughter exited the apartment "incredibly quickly" in a process that was estimated to be "twenty, thirty seconds." (Exhibit No. 5, Exhibit No. 4, pp. 26-27) The actions of Ms. Ballew and her daughter appeared to be voluntary and without obstruction to members of the tactical team stationed behind the

apartment. (Exhibit No. 7, pp. 29-30; Exhibit No. 2, p. 122) Officer Reger reported that doubts that the team was confronting a hostage "ran through his mind" when he observed Ms. Ballew and her daughter readily exiting the apartment. (Exhibit No. 7, p. 33) Officer Tippett has testified that he never believed that Ms. Ballew or her daughter were being held as hostages. (Exhibit No. 6, pp. 60, 64)

When Ms. Ballew and T.B. exited through the rear slider of the apartment, the tactical team "immediately loaded them up" into the Bearcat armored vehicle. (Exhibit No. 6, p. 9; Exhibit No. 12, pp. 27-28) Corporal Townsend communicated from the scene to Officer Mouton and the negotiation team, by telephone, that they "had" them. (Exhibit No. 4, pp. 50-51) "Sergeant Townsend started debriefing them about what was going on inside the apartment." (Exhibit No. 6, p. 59) Ms. Bellew explained to Sergeant Townsend and the tactical team that no hostages were being held in the apartment; she recounted the debriefing as follows:

> Well, they showed me a picture of [Tyran].
>
> And I said, "Yes, that's my cousin."
>
> **They asked me was he holding any hostages.**
>
> **I said, "No."**
>
> They asked me what else he was doing.
>
> I said, "Well, he's in there sleeping."
>
> And they said, "Did he play any video games today?"
>
> I said, "No. He's been sleeping all day."

(Exhibit No. 12, pp. 28-29 (emphasis supplied), 50-53).

Ms. Ballew further advised the officers that Tyran had remained in his room throughout the day of the subject occurrence except for some occasions when he went to the bathroom.

Exhibit No. 12, pp. 56-57, 34-35)[2] Officer Tippett, who was "standing at the rear of the Bearcat kind of listening for any pertinent information", recalls Ms. Ballew advising the officers in and around the Bearcat that Mr. Dobbs had been in his bedroom for "extended period of time." (Exhibit No. 6, pp. 59, 61) Ms. Ballew unequivocally explained to the officers in the Bearcat that neither she nor her daughter had been held in the apartment against their will at point in time on February 18. (Exhibit No. 12, pp. 57-58).  When expressly asked about weapons inside of the apartment, Ms. Ballew advised Sergeant Townsend there was a shotgun in her "room tucked away and [Tyran] knew nothing about. And there were no shells for it." (Exhibit No. 12, p. 33). Ms. Ballew's report about the unloaded shotgun and no other apparent weapons within the apartment was consistent with Thomas Dobbs' separate communications with other officers at the command location of the response.[3]

Officer Tippett has explained his recollection of Ms. Ballew's debriefing as follows:

…. I don't recall any questioning being directed at the child. I believe we were primarily focused on the adult female. **But they made it pretty clear that they were—nothing kind of pointed to a hostage situation** but nothing also—they

[2] Within in their Motion for Summary Judgment, Defendants repeatedly claim that Ms. Ballew advised them that Mr. Dobbs was "smoking CDS in his bedroom throughout the day. This allegation, which has no bearing on the issues on before this Honorable Court is disputed. Ms. Ballew denies having any recollection of advising Sergeant Townsend that Plaintiff Dobbs had been using marijuana on the date of the subject occurrence. (Exhibit No. 12, pp. 31)

[3] Thomas Dobbs arrived at the scene of the subject occurrence and parked his truck at the mini-mart. (Exhibit No. 13, Deposition of Thomas Dobbs, pp. 30-31) Two Howard County Police Department officers advised Mr. Dobbs of the situation and questioned him about weapons in the apartment. (Exhibit No. 13, pp. 30-31) Mr. Dobbs recounted that "[he] told them there was one shot gun, and I'm the only one that knew it was there." (Exhibit No. 13, pp. 31-32) Mr. Dobbs further denies that he made any mention of his son having a gun or suggesting that he possibly could have obtained a gun. (*Id.*) Mr. Dobbs also advised the questioning officers that the shotgun was kept behind a bunch of boxes in the master bedroom where Ms. Ballew and T.B. slept. (Exhibit No. 13, pp. 23-24) Officer Mouton has indicated that he asked Thomas Dobbs whether "there be any weapons in the house" and he responded "well, it's possible" without any indication about a specific type of weapon.  (Exhibit No. 4, p. 16)

were unaware of what was going on inside that bedroom. **They did say there was no weapons in clear view in the common area of the apartment….**

(Exhibit No. 6, pp 60-61(emphasis supplied)) Sergeant Townsend contacted Sergeant Baker by telephone and advised him of the conversation with Ms. Ballew. Baker made a made a handwritten notation of this 6:25 telephone conversation that reads as follows: "Male subject and girlfriend still inside. No explosives, unknown on guns." Exhibit No. 14, Handwritten notes By Lieutenant James Baker; Exhibit No. 3, p. 59-65). Howard County Police CAD reports also reflect a radio broadcast: "2 Females, 1 Younger, 1 Older… Older saying Male subject and girlfriend still inside. Both Female Subjs in back of Bearcat. Saying there are no explosives inside, Unk on handguns. (Exhibit No. 15, CAD Report)

Sergeant Baker was asked about the effect of the reports that had been relayed by Sergeant Townsend during the course of his deposition as follows:

> Q:      All right. And based on the reporting from these two women who had been inside the apartment, there were no explosives inside –
>
> A:      And Right.
>
> Q:      – and again, they [had not] seen a gun at any point in time—
>
> A:      Right.
>
> Q:      -- did you have any concerns at this call may not have been legitimate?
>
> A:      Yes….

(Exhibit No. 3, p. 65)

**B. Plaintiff Tyran Dobbs fully cooperated with the responding officers and was in the process of voluntarily exiting the apartment when he was struck by the L6 rounds.**

After Ms. Ballew and T.B. had exited the apartment, Officer Joshua Mouton contacted Tyran Dobbs by telephone. Mr. Dobbs sounded "groggy or tired" and reported that he had been

sleeping in his bedroom with his girlfriend. (Exhibit No. 4, p. 32) Officer Mouton explained to Mr. Dobbs "that there were police outside because they were concerned about what was going on inside." (Exhibit No. 4, p. 33) During Officer Mouton's "pretty short" conversation with Plaintiff Dobbs, who remained "pretty calm", agreed that he would get dressed and exit the apartment. (Exhibit No. 4, pp. 34-35) Lieutenant Jennifer Reidy-Hall, who was listening to the ongoing negotiations, perceived Mr. Dobbs to be "very agreeable" and compliant with all police directives. (Exhibit No. 5, pp. 34, 68-69) In fact, she has identified Mr. Dobbs as "most complaint subject" that she has ever encountered because "he said he would come out immediately" when requested to exit the apartment. (Exhibit No. 5, pp. 65-66)

The tactical team behind the apartment were notified that "negotiators were on the line with [Plaintiff Dobbs]." (Exhibit No. 6, pp. 79-80) A 6:45 pm radio communication from the tactical team evidence an understanding that Officer Mouton was the "primary negotiator" communicating with Mr. Dobbs. (Exhibit No. 4, p. 14) Sergeant Townsend subsequently advised the tactical team at the Bearact that "the negotiator said [Tyran Dobbs] was going to come out." (Exhibit No. 6, p. 69) Officer Pickett has indicted that "Staging Command" communicated that "had [Tyran Dobbs] on the phone… and that he was going to step out at some point." (Exhibit No. 8, pp. 56-57, 66).

After Plaintiff Dobbs agreed to exit the apartment, Mouton heard what he described as "a lot of, um, scuffling sounds, or like movement" that lasted for "five or ten seconds" (Exhibit No. 4, pp. 53, 36-37) A CAD report entry reflects the negotiations teams report of what was transpiring as follows: "Open line No Contact with Subj, Believe he is coming out at this time." (Exhibit No. 15) Plaintiff Dobbs then returned to the line and indicated that he was trying to go outside. (Exhibit No. 4, pp.53) Immediately after being advised that Plaintiff Dobbs was

attempting to exit the apartment, Mouton then heard what he perceived to be a female screaming "really loud." (Exhibit No. 4, pp. 54, 36-37) Officer Mouton explained when he heard on the phone at the time of the shooting as follows:

> Um, I mean, at the end of the incident, there was—I thought— I wasn't sure who it was, but it sounded like, um, I don't know what, crying, but it sounded like gurgling, like gurgling, like it was a person, and there was a lot of weird noises, you know, maybe like a whimper or like a—there was all sorts of weird noise. I wasn't sure what it was.

(Exhibit No. 4, p. 45) Officer Mouton heard Plaintiff Dobbs retrieving and putting on a t-shirt and getting struck with the rounds fired from Officer Pickett's L6.

The timing of this sequence of events was addressed at Jennifer Reidy-Hall's deposition:

Q:   When you say it happened very quickly, that was from the time that you first made contact with [Tyran Dobbs] and he said he was going to come outside until the time at which you came to understand the situation was over. When they said, L6 deployed?

A:   Yes.

Q:   So it's correct that during that window of time, you and Lieutenant Price [did not] even have sufficient time to articulate a plan of action of what was going to happen next?

A:   Yeah. I mean, unfortunately, I just don't recall how much consideration we had.

   Um, normally what we'll try to do is relay an arrest plan to the person we're on the phone with ….

*          *          *

Q:   And in this particular situation, there wasn't even time to have that conversation before you learned of the L6 deployment?

A:   Not that I remember.

(Exhibit No. 5, pp. 72-73)

### C. The use of the L6 in this case was contrary to Howard County Police training and protocols, and was simultaneously an unreasonable application of deadly force against an unarmed and non-resistive subject.

#### 1. The L6 and its permitted use.

The L6 weapon system is capable of firing "different types of ammunition" including the "impact munition" that were fired at Plaintiff Dobbs. (Exhibit No. 8, p. 9). These rounds are discharged by chemical propellants "similar to a conventional firearm." (Exhibit No. 8, pp. 9-10) The effective distance of the L6, i.e. the range at which the weapon is still accurate, is fifty yards. (Exhibit No. 8, pp. 103-104) Officer Michael Pickett has offered that generally "where you aim is the location where the baton goes." (Exhibit No. 8, pp. 14-15) The L6 is sufficiently precise that an operator could take aim at an individual's arms or legs and expect to strike the targeted appendages. (Exhibit No. 6, pp. 26-27) Moreover, when fired the L6 "doesn't kick (recoil) like a rifle or even a handgun would." (Exhibit No. 8, p. 82)

Officer Pickett's L6 had also been fitted with an upgraded laser sighting system that was installed and zeroed in February of 2015, shortly before the subject occurrence. (Exhibit No. 8, pp 16-19). This system included two "separate sites that are mounted together", a "visible laser" providing "nighttime capability" and a "red dot" that visualized through an attached reticle that functioned like "crosshairs" in a scope.  (*Id.*) During a range firing exercise when the system was being installed, Officer Pickett struck five of five targets from three yards out, five of five targets from seven yards out, five of five targets from ten yards out, five of five targets from fifteen yards out, and ten targets from twenty-five yards out. (Exhibit No. 8, p. 15)

While the L6 is characterized in the Defendant's Motion as a "less lethal" weapon, the impact of the "plastic/rubber batons" was and is commonly understood to be more violent than other similarly designated weapons/tactics. *See e.g. Phillips v. Community Insurance Corp.*, 678

F.3d 513, 521 (2012) ("The record establishes that the force exerted by an SL6 bullet is roughly comparable to a projectile from a bean-bag shotgun. Other courts of appeals have observed that baton launchers and similar 'impact weapons' employ a substantially greater degree of force than other weapons categorized as 'less lethal' such as pepper spray, tasers, or pain compliance techniques.") Officer Pickett had personally fired L6 "rubber batons to break… doors." (Exhibit No. 8, pp. 11-12) Accordingly, the Howard County Police Department had restricted the manner its tactical officers were permitted to target the L6. (Exhibit No. 8, p. 22).

Officer Pickett has conceded his understanding that he was only permitted to aim the L6 at an individual's "center mass, stomach area, arms and legs" and that he had been specifically taught not the fire at that person's head, neck, sternum (which he characterized as chest or heart). (Exhibit No. 8, p. 79) Because the "tactical team" had talked "about it a lot during training and stuff", he understood in 2015 the head, back and sternum were "prohibited areas at which [he] could not fire the L6." (Exhibit No. 8, pp. 104-105; see also Exhibit No. 2, Deposition of Thomas Townsend, p 42 (When targeting L6 officers "[l]ooking for abdomen area. You want to stay away from the head, neck, sternum, spine and groin.")) Sergeant Townsend explained that the training was only for "certain weapon systems" including the L6 and stated: "You want to avoid these areas because, again, it is potential of being a lethal strike." (Exhibit No. 2, pp. 43-44)

Moreover, the circumstances in which a Howard County police officer may permissibly fire an L6 are limited. Officer Pickett testified at deposition that "from day one of the Academy, [Howard County Police Officers] learn the basic use of force, which has the Continuum, the levels, and what tools [officers] can and can't use as the force goes up or comes down." (Exhibit No. 8, p. 20) He explained this continuum as follows:

So basically, it starts out like low-level, like talking to someone. Giving commands. That would be just dialogue.

And then for whatever reason, if an arrest or apprehension has to be made, then the person … just doesn't listen to your commands that's like passive [resistance], like they just stand there.

If they try to leave when they're under arrest or need to be taken into custody, that's like what we call active resistance, where he's trying to leave, or not be arrested or taken into custody.

And then if they actually assault you were someone else to try to get away, that's active aggression, so as we go up, it gets higher, which different tools can be used.

And then the highest is deadly threat, deadly force by them that we can return and use a handgun or any other deadly force.

(Exhibit No. 8, pp. 20-21, L 18-14) Officer Pickett's testimony regarding the Howard County Police Department's adherence to the Use of Force was consistent with testimony offer by Townsend, Tippett, and Reger.[4] Officer Pickett explained that "it was always understood [that] at least active resistance, generally some kind of overt aggressive act before [the tactical team] would use [the L6]." (Exhibit No. 8, p. 22) Upon further questioning, he indicated that use of an L6 was permitted when officers were confronted with behavior that fell between active resistance (i.e. "you tell someone they're under arrest, and they run away, or they do something overt to deny you the arrest") and active aggression  (i.e. "you tell them they're under arrest and they try to punch you in the face… like where they actually do something aggressive more than

---

[4] Officer Tippett essentially echoed the testimony. (Exhibit No. 6, Deposition of James Tippett, pp. 21-24) Sergeant Townsend acknowledged the Howard County SWAT trained on the Use of Force Continuum. (Exhibit No. 2, p. 48) PFC Brian Reger likewise testified that Howard County tactical officers were bound by the Use of Force Continuum, and he explained that the "permissible use of force is determined by the amount of force that a subject would" direct at police. (Exhibit No.7, pp. 7-8) The prompting force would be measured in terms of (1) "passive resistance" which he described as ignoring commands; (2) "active resistance" which he described as "pulling away from an officer's attempt to control you"; (3) "active aggression" which is an "assault"; and (4) "deadly force which is self-explanatory. (Exhibit No. 7, pp. 7-8)

just trying to get away") on the continuum.  (Exhibit No. 8, p. 25; See also Exhibit No.  6, pp. 24-25 (testifying that (1) "when he first got on the tactical team" utilization of lee lethal rounds was permitted when tactical officers encountered an actively resisting subject;  (2) at present utilization of less lethal rounds is permitted when officers encountered an active aggression; and (3) he was unable to identify which protocol controlled at the time of the subject occurrence)

> **2. Officers Townsend and Pickett predetermined that the L6 would be fired at Plaintiff Dobbs when he was not actively resisting nor acting in an overtly aggressive manner.**

Plaintiff Dobbs first learned about the police response to his apartment when he received Officer Mouton's telephone call. (Exhibit No. 16, Deposition of Tyran Dobbs, pp. 36-37). Mr. Dobbs woke his girlfriend Amelia, advised her to get dressed, and then walked out of his bedroom to gather some clothing because he "didn't have anything on." (Exhibit No. 16, p. 38) He described what then transpired at his deposition as follows:

> I told her to put some clothes on and get dressed. I told her the police [were] there. I said, we have to leave out [of] the house. And I went to go to the kitchen to look for some pants. That's what I first encountered the officers.
>
> And I got to the end of the hallway. And I didn't know they were in the back there, so it kind of surprised me.
>
> I stopped when I [observed] them, because I [observed] like lights and I [observed]—I [observed] a couple of officers like in the darkness like behind the bushes and all throughout the back porch. I don't know how many. I [observed] the lasers and stuff.
>
> So I stopped. And they were yelling I think, hands in the air, hands in the air. And I told them, I said, I was just on the phone with an officer. I said, I'm getting my clothes. I said my girlfriends in the back. I said I'm going to get my girlfriend.
>
> So I turned around to get Amelia. And I went back in the room. And I just-at that point, she was already dressed. I just grabbed a shirt and I told her, come on. I told her to get behind me. And we made our way to the living room.

But this time when I got to the end of the hallway, before I knew it, I got hit with something in my face, in my eye. I couldn't see anything. I stumbled back and I felt another impact to my ribs. And I fell down.

(Exhibit No. 16, pp. 48-50, 68-69; Exhibit No. 17, Tyran Dobbs' Answers to Interrogatories, Answer 9; Exhibit No. 16, p. 53 (repeating that he was shot in the eye first and then in the ribs)).

Plaintiff Dobbs denies that he stepped out onto the patio or reentered the apartment before the L6 had been fired at him. (Exhibit No. 16, p. 61; Exhibit No. 17, Answer 9) He has explained that at the time that he first "stopped", when "[he] was looking at everything", he was still inside of his apartment. (Exhibit No. 16, pp. 56-58) Officer Pickett testified at deposition that this was the first occasion that he observed Plaintiff Dobbs. (Exhibit No. 8, p. 66). Officer Pickett explained that Plaintiff Dobbs, who "[came] to the door with a phone in one hand and a cigarette in the other" "was wearing either like shorts, or boxer shorts…. And he didn't have a shirt on at all." (Exhibit No. 8, p. 68) From Officer Pickett's vantage point, Mr. Dobbs "appeared to be on the phone, but [he] couldn't hear what he was saying." (*Id*.)

For purpose of justifying his use of force, Officer Pickett now maintains that at the time of this first sighting Plaintiff Dobbs had "stepped out on…the patio, concrete pad, but he never stepped off the pad…" (Exhibit No. 8, p. 69) This assertion is inconsistent, however, with a transcript of 6:45 radio communication stating that Plaintiff Dobbs was "at the backdoor **inside** the apartment." (Exhibit No. 5, pp. 57-59, 61 (emphasis supplied)) Sergeant Townsend has acknowledged that at the time of the 6:45 radio transmission, Plaintiff Dobbs was still inside of the apartment. (Exhibit No. 2, pp. 130-133)

Officer Tippett also had occasion to visualize Mr. Dobbs on this first occasion when he "exposed himself to the open area of the slider where [the tactical team could] see him." (Exhibit No. 6, pp. 70, 73) He explained: "And then I remember at one point Mr. Dobbs kind of walked to

that slider that we were facing in plain view to us. It appeared that he was on the phone…."
(Exhibit No. 6, p. 69) Officer Tippet has testified that Plaintiff Dobbs had a cell phone in one
hand and a cigarette in the other and "he didn't appear to be armed." (Exhibit No. 6, pp. 74-75;
see also Exhibit No. 8, p. 67) He believed Plaintiff Dobbs "to be on the phone with negotiators"
because notice that "negotiators were on the line with [Mr. Dobbs]" was "passed" to the tactical
team "before or after that first exposure." (Exhibit No. 6, pp. 67, 80) Officer Tippett has testified
that it is possible that "[Mr. Dobbs] didn't actually walk onto the patio at all" and "[h]e could
have been a foot or two …  inside the doorway." (Exhibit No. 6, pp. 75-76)

Officer Sean Garroway recounted the happenings as follows: "[t]he male walked towards
the rear slider with a cell phone in hand…the male stood at the threshold of the rear door..."
(Exhibit No. 18, DFC Garroway Report; see also Exhibit No. 19, Deposition of Sean Garroway,
pp. 79-80) Sean Garroway was unable to state whether Tyran Dobbs was immediately outside of
the threshold or immediately inside of the threshold at the time. (Exhibit No. 19, pp. 80-82)

When Plaintiff "moved to the left" he was no longer visible in the slider. (Exhibit No. 6,
pp. 70, 73). While Plaintiff Dobbs was briefly away from the door, Townsend and Pickett
predetermined that he would be fired upon with the L6. This decision was addressed during the
following portion of Officer Pickett's deposition:

> So we had a conversation between the first and second time [that
> Officer Pickett observed Plaintiff Dobbs on the scene] that if he was going
> to go back in, we were going to deploy it.
>
> There wasn't a conversation while he was outside, to deploy it.

Q:     So that conversation would have happened during that window of time
        that Mr. Dobbs was not visible to you?

A:     Right.

Q:    And that conversation was between you and Corporal Townsend, just the
      two of you, is that correct?

A:    Correct.

Q:    And it was [Sergeant Townsend] who gave you the directive to deploy the
      L6 the next time [Plaintiff Dobbs] came to the door?

A: Right.

(Exhibit No. 8, pp. 75-76, 106-108) Sergeant Townsend has also conceded that "[he] told Pickett

we're not going to allow him to go back inside… so I told him when he comes out again if he

doesn't follow commands we'll deploy the L-6." (Exhibit No. 2, p. 133)

Officer Pickett was unable to pinpoint exactly how much time elapsed between the first

occasion that he observed Plaintiff Dobbs and the second occasion that he observed Plaintiff

Dobbs but stated it "wasn't very long." (Exhibit No. 8, p. 72-73)[5] Plaintiff Dobbs next

approached the sliding glass door "he came out with the phone, kind of same as before, except he

had a t-short on this time." (Exhibit No. 8, p. 77) Officer Pickett explained the events that

culminated in firing of the L6 as follows:

> So he was again, standing there with the phone. There were commands to
> come out….
>
> It looked like he wasn't going to comply. He's just like the first time. He
> started taking a step back towards the open door, and as he took that step to go
> back inside, I deployed the L6.

(Exhibit No. 8, 77) This interaction was partially recorded by "two civilians", and the recording

indicates that only seven to eight seconds transpired between the time of the first command

---

[5] Officer Pickett testified that he only observed Tyran Dobbs on two occasions, the first time he
was at the door and we he subsequently fired at him with the L6. (Exhibit No. 8, p. 73) Officer
Tippett has indicated, however, that he may have observed Plaintiff Dobbs during a "very, very
brief [intervening] exposure at the slider." (Exhibit No. 6, p. 82) Officer Tippett does not believe
that Mr. Dobbs stepped out onto the patio during this second exposure. (Exhibit No. 6, p. 84)

issued to Plaintiff Dobbs and the deployment of the L6. The audio from the video recording, in which the tactical officers but no Plaintiff Dobbs can be seen, was distilled by Howard County Police investigators as follows:

- Commands can be heard from officers at the Bearcat toward the residence as following:
  - Inaudible but vocal statements from :01 through :04 (seconds)
  - :05 – What was that again?
  - :06 – Put both hands up
  - :08 – Alright man put your hands up
  - :10 – Put your hands up
  - :11 – Put em up, put em up (from Bearcat PA) and multiple other commands that are inaudible from other officers
  - :13 – Deployment of first and second L6 rounds
  - :14-Crying/moaning coming from residence

(Attached Exhibit No. 20, Transcript of Howard County Police Department Investigation, pp. 2529-2530) Significantly, none of the officers on the scene advised Plaintiff Dobbs that he was under arrest or that they intended to use force before the L6 was fired at him. (Exhibit No. 8, pp. 112-113) At 6:46, within a minute of the tactical officers first sighting of Plaintiff Dobbs, the use of the L6 had been broadcast by radio transmission. (Attached Exhibit No. 11).

**D. Whether Plaintiff Dobbs was attempting to reenter the apartment or actively resisting police commands is a matter of disputed fact.**

Officer Pickett has offered that the "active resistance" justifying his use of the L6 was Plaintiff Dobbs' act of stepping "back towards the house when he was told to come toward us." (Exhibit No. 8, pp. 94-96; Exhibit No. 21, Use of Force Report authored by Michael Pickett). He described Plaintiff Dobbs engaged in an activity that he perceived as "taking a step back towards the open door" without turning around at any point in time. (Exhibit No. 8, p. 77-80; Exhibit No. 2, pp. 143-146) Whether this physical retreat or any active resistance actually occurred is matter of dispute amongst the tactical officers behind the residence.

Officer Tippet who was immediately next to the Reger and Pickett has explained the events culminating in the firing of the L6 as follows:

> I remember him being partially in the slider, partially outside of the slider, no more than a step outside the slider, and we gave him commands to come to us, to put his hands up. He kind of did what he had done previously, which is, to me, it was clear that he was acknowledging us but still not complying with us. He didn't put his hands up. He didn't walk towards us.
>
> At that point, after, again what felt like a few seconds, several seconds, I don't know what the time was, Pickett discharged his L6. I heard two. I could hear that he discharged two rounds form his L6. Mr. Dobbs fell backward, kind of in the area of the slider. He began kind of screaming loudly. He was face down.

(Exhibit No. 6, pp. 85-86) Officer Tippett has testified that at the time of the shooting Plaintiff Dobbs was directly oriented towards the Bearcat, had not turned, and was not "making any movement to go backward", and "he was standing still." (Exhibit No. 6, pp. 85-86)

Officer Reger, who was "within arm's reach" of Officer Pickett when the L6 was fired, has testified in a contrary fashion that Plaintiff Dobbs "bladed" his body or "turned and it appeared as though he was going back inside the apartment through the sliding glass door." (Exhibit No. 7, pp. 42-47) He has nevertheless acknowledged that he never observed any behavior by Plaintiff Dobbs that he deemed to amount to "passive resistance", "active resistance" or "active aggression" at the scene of the occurrence. (Exhibit No. 7, pp. 57-58)[6] .Officer Reger has also conceded that he never observed Mr. Dobbs to be in possession of an object that he would have perceived to be a weapon on the scene, nor did he see him posturing in a manner that caused him to believe he was armed. (*Id*.)

---

[6] Officer Reger later changed this testimony by way of an errata sheet. Upon being re-deposed he claimed he believed Plaintiff's act of turning 90 degrees toward the rear sliding door amounted to active resistance. (Exhibit No. 22, Second Deposition of Brian Reger, pp. 7-8)

**E. Even that Officer Pickett's use of the L6 was warranted, *arguendo,* the manner in which it was aimed was unnecessary and unlawful.**

Officer Pickett explained what a double tap is "[t]he only gap – because a central firearm you can go bang-bang. This one cycles, so it goes bang, click, bang…. It takes a little longer for that second one, so it's not as fast as a conventional handgun shot like a bang-bang. It's going to be slower." (Exhibit No. 8, p. 81) Sergeant Townsend testified that when the L-6 is fired, you can hear "[a] pop, and then the cylinders will start. They'll rotate for the next round." (Exhibit No. 2, pp. 167) Officer Pickett claims that he "double-tapped" the shots in quick succession. (Exhibit No. 8, p. 81). Sergeant Townsend has testified, however, that the interval between the shots was sufficiently long in duration that he had time to turn and begin to disembark from Bearcat before he heard the follow-up shot. (Exhibit No. 2, pp. 168, 170-71) Neither Townsend nor Pickett have offered any testimony that Plaintiff Dobbs was actively resisting when the second shot was fired. Because Officer Pickett testified that Tyran Dobbs "went to the ground. Kind of like almost sat down, best way to described it" after being struck by the L6, there is no factual justification for the second shot. (Exhibit No. 8, p. 83)[7]

The record also demonstrates that Officer Pickett knowingly aimed at areas of Plaintiff Dobbs' body that he understood to be prohibited from targeting. It is a matter of undisputed fact that the baton rounds fired from the laser sighted weapon at close range struck Plaintiff Dobbs in the central portion of his face and left anterior chest/sternum area. (Exhibit No. 23, Photographs

---

[7] Officer Townsend denies that L6 baton had any effect on Plaintiff Dobbs. Sergeant Townsend claims that the initial shot strike Tyran Dobbs in the "abdomen area." (Exhibit No. 2, pp. 167-68) Sergeant Townsend testified that the initial strike had "limited effect" on Tyran Dobbs. (Exhibit No. 2, pp. 169) During his deposition, Sergeant Townsend elaborated on what he meant by "limited effect," "we didn't get what I expected to happen, buckling him and having him go to the ground." (Exhibit No. 2, pp. 169-70) Sergeant Townsend further testified that Tyran Dobbs did not move in response to being struck by the first round. (Exhibit No. 2, pp. 170)

of wounds). As a result of being struck by the rounds, Plaintiff Dobbs suffered serious injuries including "highly comminuted fractures of the anterior, medial and lateral wall of the left maxilla and nasal bones" "anterior left medial and lateral orbital walls" and inferior left ethmoid air cell", as well as, a fracture of his T6 rib and pulmonary contusions. (Exhibit No. 24, Redacted Discharge Report from University of Maryland Shock Trauma Center). His injuries necessitated inpatient hospitalization that spanned three days.

## II.   ARGUMENT

### A.  Summary Judgment Standard

The Honorable Court's role under Rule 56 is limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *Anderson Liberty v. Lobby, Inc.*, 477 U.S. 242, 249 (1986). In the context of this evaluation, the evidence of the non-moving party is to be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *See, Hunt v. Cromartie*, 526 U.S. 541, 550-55 (1999); *see also Anderson Liberty*, 477 U.S. at 255. "In conducting this review, 'it is not [the Court's] job to weight the evidence.'" *Meyers v. Baltimore County, Md.*, 713 F. 3d 723, 730 (4th Cir. 2013) (quoting *Gray v. Spillman*, 925 F. 2d 90, 95 (4th Cir. 1991)). "Summary Judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson Liberty*, 477 U.S. at 248.

### B.  Excessive Force

The Fourth Amendment's prohibition against unreasonable seizures protects not only against arrests made without probable cause, but also against the use of excessive force in making

arrests that are themselves supported by probable cause. *See Tennessee v. Garner*, 471 U.S. 1, 7-8, 105 S.CT. 1694, 85 L.Ed. 2d 1 (1985) (Court flatly rejected the suggestion that the Fourth Amendment's reasonableness requirement is satisfied so long as the seizure itself is supported by probable cause, holding that the reasonableness of a seizure depends not only on when it was made but also on how it was carried out); *See also Graham v. Connor*, 490 U.S. 386, 395, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989) (Claims that law enforcement officers used excessive force when making an arrest "should be analyzed under the Fourth Amendment."); *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir. 1970) (Fourth Amendment provides constitutional protection against use of excessive force during arrest that is vindicable through § 1983).

Reasonableness in the context of an excessive force claim is determined by the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "inquiry into the reasonableness of the force also requires [a Court] to 'consider the facts **at the moment that the challenged force was employed**' 'with an eye toward the proportionality of the force in light of all the circumstances.'" *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (emphasis supplied) (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)).

Defendants contend that the first *Graham* factor should be weighed in their favor because the terms of "hostages", "explosives" and "gun" were uttered during the fraudulent call that prompted the subject encounter. For purposes of their argument, Defendants gloss over the significant happening that occurred after the time of that call and before the moment of challenged force. When Sergeant Townsend directed Officer Picket to fire the L6 at or around 6:45pm and

when Officer Picket later fired upon Plaintiff Dobbs at or about 6:46 pm, the responding tactical officers on the scene new or reasonably should have known that no criminal enterprise was afoot.

By their own admission, at the time of their initial response to the residence, Howard County Police officers understood that they might be responding to a "swatting call or something of that nature." There was no visible evidence indicative of an ongoing hostage during the period when tactical officers were situated behind the apartment. Ms. Ballew and her daughter, who were both purported to be hostages, had walked out of building immediately upon being summoned by negotiators. By 6:23pm, Ms. Ballew had expressly advised Sergeant Townsend that there were no explosives in the apartment and that no one had been held hostage in the apartment. She had also explained to the tactical officers that the only weapon on the premises was an unloaded shotgun, about which Plaintiff Dobbs had no knowledge.

When negotiators subsequently contacted Plaintiff Dobbs, his response was consistent with Ms. Ballew's report that he had been asleep in his bedroom throughout the day. Plaintiff Dobbs, who negotiators have described as calm and cooperative, immediately agreed that he would get dressed and exit the apartment. Tactical officers were notified of this development. Consistent with his agreement, Mr. Dobbs emerged from his bedroom at which point he was observed through the rear door wearing only boxer shorts. He did not appear to be armed and tactical officers assumed that he was still talking to the negotiating team. Mr. Dobbs then put on a t-shirt and at approximately 6:46pm he emerged from the backdoor of the apartment. Because these happening are dispositive of any criminal occurrence, the first *Graham* factor should be weighed in favor of Plaintiff Dobbs.

The second *Graham* factor requires this Court to evaluate what, if any, **immediate** threat Plaintiff Dobbs posed to responding police officers or others located in the vicinity of the

occurrence. Defendants have no legitimate claim of a perceived threat directed at them. When the L6 was fired, the responding tactical officers were stationed in and around an armored vehicle that was mounted with an armored turret and ballistic glass. These officers, who were separately protected by "rifle rated" body armor, each carried a laser sighted rifle and pistol. Their personal protection was fortified by counter snipers who were also present on the scene with laser sighted rifles. They were all stationed away from Plaintiff Dobbs in a position of relative safety. By comparison, Plaintiff Dobbs was wearing a t-shirt and a pair of boxer shorts. The only objects on his person were a cellular telephone and at one point a cigarette. As has been acknowledged by Officers Tippett and Reger, there was no indication that he was armed nor was there any legitimate reason to believe that he might be carrying a weapon. There also is no indication in this case that Plaintiff Dobbs took up a fighting stance or acted in an overtly aggressive manner toward any tactical officers.

In the absence of any legitimate claim that Plaintiff Dobbs threatened their safety, the Defendants maintain that Plaintiff Dobs could possibly have posed some nebulous threat to his girlfriend who was then believed to be in his bedroom. Because she was not present in the vicinity of the shooting, however, there is no basis to conclude that this threat was immediate. Nor is there any basis to conclude that potentially lethal force was necessary to abate such a threat. At the very least, the issue is a matter of disputed fact. Consideration of the evidence in the light most favorable to Plaintiff Dobbs, does not support an inference that Dobbs was a danger to the defendant officers and/or any third persons at the time the L6 was discharged.

The third and final *Graham* factor, requires this Court to consider whether Plaintiff Dobbs was actively resting arrest and/or attempting to flee efforts to be detained at the moment force was used. Because Defendants Townsend and Pickett reached a decision that the L6 would be fired at

Plaintiff Dobbs before emerged from the apartment, their argument that he was somehow actively resisting arrest should be received with skepticism. The predetermination vitiates any claim that was a tense, uncertain, and rapidly evolving situation that required split-second decisions. The record evidence does not support their claim that Plaintiff Dobbs was acting erratically or walking in and out of the apartment. Rather, it supports a conclusion that tactical officers observed Plaintiff Dobbs within the apartment while he was retrieving his clothing, then observed him attempting to exit the apartment once he had done so, and finally fired upon him less than ten seconds after he had been directed to put his hands up as he attempted to exit the apartment.

There is no record evidence from which it may be reasonably inferred that Plaintiff Dobbs was attempting to assault the tactical officers or run at that moment in time. In the absence of any evidence of overt resistance, Defendants maintain that Plaintiff Dobbs act of stepping backward to reenter the apartment constituted active resistance. However, their assertions are inconsistent with Officer Tippett's admission that Plaintiff Dobbs was standing still when the L6 was fired, and Officer Reger's initial testimony that he had not observed any conduct by Plaintiff Dobbs that amounted to active resistance. The argument is also inconsistent with police testimony indicating that Plaintiff Dobbs did not appear to be armed, was facing the officers and had not turned around at any point in time. To the extent that Tyran Dobbs perceived conduct, i.e. not following order and placing his hands in the air and/or taking a step backwards, could be considered "resistance" at all, it would have been passive noncompliance, not the nature of a resisting that would have warranted an escalation of force. Sergeant Townsend and Officer Pickett have both conceded that that L6 could not be lawfully fired in such circumstances.

Application of the *Graham* factors, with a consideration of the record evidence in the light most favorable to Plaintiff Dobbs, compels a conclusion that the force was not objectively

reasonable in light of the totality of the circumstances in the case. *See Jones v. Buchanan*, 325 F.3d 520, 532 (4th Cir. 2003) (courts have consistently held that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner…") Because the determination of reasonableness depends on a determination of what version of events and/or what combination of facts is to be believed, there must be a trial on the excessive force action asserted under 42 U.S.C. § 1983 and for violation of Maryland State rights against Officer Pickett and Corporal Townsend.[8]

Immediately following the deployment of the L6 rounds, Tyran Dobbs went to the ground. Tyran Dobbs was essentially incapacitated as a result of being struck by the L6 rounds. Howard County Fire Department personnel noted that Tyran Dobbs was "initially altered to time and place" and "pt's nose suffered significant trauma resulting a rupture type injury of the soft tissue exposing bone/cartilage." (Exhibit No. 25, Howard County Fire Department Records) Officer Tippett approached Tyran Dobbs to move him out of the threshold of the sliding door. (Exhibit No. 6, p. 97) Officer Tippett then placed Tyran Dobbs' hands behind his back and placed flex cuffs on him. (Exhibit No. 6, p. 98-99) Given all of the aforementioned facts and circumstances prior to the discharge of the L6 Howard County Police officers, including Officer Tippett, knew or should have known that Tyran Dobbs was not a suspect and that the phone call was the result of swatting. Additionally, immediately upon approaching Tyran Dobbs, Officer Tippett noted that Tyran

---

[8] The Maryland Declaration of Rights is the rule of law which secures the liberty interests of citizens residing in this State and mirrors the federal Constitution. *See Beeman v. Department of Health and Mental Hygiene*, 107 Md. App. 122, 666 A.2d 1314, 1323 (1995) ("state constitutional rights are... considered in *pari materia* with their federal counterparts."); *Kirch v. Prince George's County*, 331 Md. 89, 626 A.2d 372, *cert. denied*, 510 U.S. 1011, 114 S.CT. 600 (1993). "Excessive force in making an arrest is a violation of [Maryland Constitution, Declaration of Rights] Article 24, for which a civil claim for damages may lie." *Tavakoli-nouri v. State*, 139 Md. App 716, 730 (2001).

Dobbs did not resist at all. (Exhibit No. 6, p. 98) Furthermore, it was apparent immediately that Ms. Friedman was not a hostage and that there were no explosives. Officer Tippett testified, that the apartment was very small, and officers would move very quickly to clear the apartment. (Exhibit No. 6, p. 99-100) Given the circumstances, Officer Tippett's action in physically arresting Plaintiff Dobbs was unlawful.

### C. Qualified Immunity

"Qualified immunity balances two important interests-the need to hold public officials accountable when the exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. C F.allahan*, 555 U.S. 223, 231, 129 S.Ct. 808 (2009); *Harlow v. Fitzgerald*, 475 you. S. 800, 818, 102 S.Ct. 2727 (1982) (qualified immunity protects government officials "from liability for civil damages in so far as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") Defendants maintain that they are entitled to the protection of this immunity because "neither the Supreme Court nor the Court of Appeal for the Fourth Circuit has established parameters for the use of baton rounds…." (Motion for Summary Judgment, p. 22) However, a case directly on point is not required for a right to be clearly established and "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Peizer,* 536 U.S. 730, 741, 122 S. Ct. 2508 (2002)[9]

---

[9] *See also White v. Pauly,* 580 U.S. ____, 137 S.Ct. 548, 551 (2017) (*per curiam)* ("this Court's caselaw does not require a case directly on point for the right to be clearly established.") *Safford Unified School District v. Redding*, 557 U.S. 364, 129 S. Ct. 2633, 2643 (2009) ("There is no need that the very action in question [have] previously been held unlawful.") *Meyers v. Baltimore County,* 718 F.3d 723,733-35 (4th Cir, 2013) ("[T]he absence of a judicial decision holding that it is unlawful to use a Taser repeatedly and unnecessarily" on an unarmed, restrained, non-resisting individual "does not prevent a court from denying a qualified immunity defense."); *Brockington v. Boynkins*, 637 F.3d 503, 508 (4th Cir. 2011) ("[I]t is not required that the exact conduct has been

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." *Saucier v. Katz*, 533 U.S. State another way, an officer is deemed to "understand that what he is doing violates" a clearly established rights when unlawfulness of his conduct is apparent "in the light of pre-existing law." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987) Any reasonable officer in the position Sergeant Townsend and Officer Pickett would have understood that the use of the L6 was unlawful in the circumstances of this case. Sergeant Townsend issued the directive that Officer Pickett utilized the L6 if it looked like Plaintiff Dobbs might attempt to reenter the apartment. Plaintiff Dobbs denies that he was outside of the apartment at that point in time. Even, if we are to accept the testimony of the various officers involved in this instance, there is no indication that Mr. Dobson actually initiated an effort to get back into the apartment.

Although the L6 is characterized in the Defendant's Motion as a "less lethal" weapon, the impact of the "plastic/rubber batons" was at the time of the subject occurrence commonly understood to be more violent than other similarly designated weapons. *See e.g. Phillips v. Community Insurance Corp.*, 678 F.3d 513, 521 (7th Cir. 2012). Courts of appeals have observed that baton launchers and similar "impact weapons employ a substantially greater degree of force than other weapons categorized as 'less lethal,' such as pepper spray, tasers, or pain compliance techniques." *Phillips v. Community Insurance Corp.*, 678 F.3d at 521.[10] Sergeant Townsend

---

found unconstitutional in a previous case... Indeed, it is just common sense they continuing to shoot someone who is already incapacitated is not justified under the circumstances.")

[10] S*ee also Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) (an officer provided expert testimony that a "Use of Force Continuum...would list an impact weapon high on the scheduled of force" and that "[i]t would be unreasonable for an officer to use an impact weapon on an unarmed person"); *Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006) (officer testimony regarding Chicago Police Department policies limiting the use of "impact weapons" to "high-

acknowledged that Howard County Tactical team members understood that the L6 baton rounds could be fatal. Officer Pickett had testified that rounds were capable of being fired through solid doors and that he had been expressly trained that they could only be permissibly fired upon a subject whose conduct was escalating from active resistance to an overt assault.

By their own admissions, Townsend and Pickett decided to fire potentially fatal rounds at Plaintiff Dobbs at the first sign of passive resistance. The record supports a conclusion that they subsequently elected to carry out this plan ten seconds after commands were issued to Plaintiff Dobbs and while Plaintiff Dobbs was standing still and non-resistive. This conduct voids any claim of qualified immunity in this case.[11]

The manner in which the L6 was fired is also dispositive of qualified immunity. Officer Pickett testified that he was trained that the head and neck were prohibited areas. Because the first baton round fired at Plaintiff Dobbs struck him in the face and the second projectile struck him about the sternum, it is apparent that the L6 was targeted in a manner that was contrary to training.

---

level, high-risk assailants" and describing such weapons as "unwarranted against a suspect resisting arrest" by punching and struggling); *and Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir.) (observing that the SL6 weapon "is classified as a 'less lethal' munition, [but that local] police regulations recognize that I can be used as a deadly weapon").

[11] *See Yates v. Terry*, 817 F.3d 877 (4th Cir. 2016) ("The objective facts, when viewed in the light most favorable to Yates as we must do at this point in the proceedings, show that he was neither a dangerous felon a flight risk nor an immediate threat to Terry or anyone else," therefore the use of a taser constituted excessive force); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) (law was sufficiently clear to inform reasonable officer "that it was unlawful to catering nonviolent, suspected misdemeanant who was not fleeing resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's command was to disobey two orders to end her phone call to 911 operator"); *Giles v. Kearney*, 571 F.3d 318, 327 (3rd Cir. 2009) ("No reasonable officer could agree that striking and kicking a subdued, non-resisting inmate in the side, with force enough to cause a broken rib and collapsed lung, was reasonable or necessary under established law."); *Valladares v. Cordero*, 552 F.3d 384, 390 (4th Cir. 2009) (clearly unlawful to break jaw of suspect after he surrendered); *Morelli v. Webster*, 552 F.3d 12 (1st Cir. 2009) (clearly unlawful to use force that resulted in torn rotator cuff a woman who was unarmed, nonviolent, and suspected of theft of $20.00); *Reese v. Herbert*, 520 7F. 3B 1253, 1274 (11th Cir. 2008) (no particularized, pre-existing case law needed to inform officer that he is not entitled to qualified immunity for severe beating of a restrained, nonresisting suspect); *Hadley v. Guiterrez*, 526 F.3d 1324, 1333 (11th Cir. 2008) ("We hold that a handcuffed, nonresisting defendant's right to be free from excessive force was clearly established in February 2002.").

Even if this Honorable Court were to accept Office Pickett's claim that he first targeted Plaintiff's gut and the baton that fractured his ribs caused the him to then bend over, there is no explanation in this case as to why the second shot that followed was necessary. Pickett's sole explanation is that in some other situations a single rounded had not been effective, he is not offered any explanation in this case as to why a second shot became necessary. Notably, at the time of this occurrence there were cases from other jurisdictions establishing that Townsend and Pickett's conduct violated clearly established rights. *See Glenn v. Washington County*, 673 F.3d 864, 866, 873 (9th Cir. 2011) (reversing summary judgment for defendant officers who used beanbag shotgun and semiautomatic weapon during encounter with intoxicated individual brandishing pocketknife); *Mercado v. City of Orlando*, 407 F.3d 1152, 1156, 1160-61 (11th Cir. 2005) (reversing summary judgment who, at close range, fired rubber baton at the head of plaintiff); *Deorle v. Rutherford*, 272 F.3d 1272, 1273 (9th Cir. 2001) reversing summary judgment for officer who had fired beanbag round into face of unarmed individual approaching officer).

Defendants also are not entitled to any qualified immunity with respect Plaintiff Dobbs' Maryland Declaration of Rights claims. In *Clea v. Baltimore*, 312 Md. 662, 680-685 (1988), the Court of Appeals explained:

> There are sound reasons to distinguish actions to remedy constitutional violations from ordinary tort suits. The purpose of an ordinary tort suit is not specifically to protect individuals against government officials or to restrain government officials....
> On the other hand, constitutional provisions like Article 24 or 26 of the Maryland Declaration of Rights... are specifically designed to protect citizens against certain types of unlawful acts by government officials. To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the constitutional provisions. It would also... largely render nugatory the cause of action for violation of constitutional rights....

312 Md. At 684-8.

### D. State Common Law Claims

Under Maryland law, a battery is an offensive touching without legal justification. *Saba v. Darling*, 320 Md. 45, 49 (1990).

The necessary elements of a false imprisonment claim is "a deprivation of the liberty of another without his consent and without legal justification." *Montgomery Ward v. Wilson*, 339 Md. 701, 721 (1995). "A police officer carrying out either an arrest under a warrant or a warrantless arrest is not liable for false imprisonment in connection with that arrest if the officer had legal justification to arrest under the circumstances." *Montgomery Ward*, 339 Md. at 721. The objective lawfulness of the arrest, rather than the good faith or reasonable belief of the arresting officer, determines liability for the tort. *See Great Atl. & Pac. Tea Co. v. Paul*, supra, 256 Md. at 654, 261 A.2d at 738; *Safeway Stores, Inc. v. Barrack*, supra, 210 Md. at 173-174, 122 A.2d at 460; *Fleisher v. Ensminger*, supra, 140 Md. at 620, 118 A. at 159.

> "Thus, while the presence or absence of probable cause to believe that a crime was committed may be pertinent in some cases with regard to the lawfulness of the arrest, the actual element of the tort of false imprisonment is legal justification rather than probable cause. To the extent that the lawfulness of an arrest does not turn upon probable cause under Maryland law, probable cause will not be determinative of the legal justification issue in a false imprisonment action based on that arrest."

*Ashton v. Brown*, supra, 339 Md. at 120.

As set out above, the factual record in this case does not compel a conclusion that the level of force Sergeant Townsend instructed Officer Pickett directed at Plaintiff Dobbs was reasonable under the circumstances. Nor does the record evidence compel a singular conclusion t that Officer Tippett lawfully arrested Plaintiff Dobbs. Defendants are accordingly not entitled to summary judgment on Tyran Dobbs' battery and false imprisonment claims.

### III.   <u>Conclusion</u>

There are genuine disputes of material fact in this case which preclude summary Judgment with respect to Plaintiff Dobbs' claims of Battery, False Imprisonment, for the violations of his federal constitutional rights under 42 U.S.C. § 1983, and his claims for violations of Maryland Declaration of Rights. The same disputes of fact vitiate the defendants' respective claims of qualified immunity.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court deny Defendants Motion for Summary Judgment with respect to each of the claims referenced above, and grant such further and additional relief as it deems to be necessary and appropriate.

Respectfully submitted,

_____ - s _____
Anton L. Iamele, Federal Bar No. 14845
201 North Charles Street, Suite 700
Baltimore, Maryland 21201
aiamele@iamelelaw.com
Telephone: 410-779-6160
Facsimile: 410-779-6161
*Counsel for Plaintiff Robin Ann Burkhart*

## HEARING REQUEST

Plaintiff hereby requests that a hearing be held on Defendants' Motion for Summary Judgment, and the instant Opposition to the same.

_____ - s- _____
Anton L. Iamele

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 4th day of January, 2019, a copy of the foregoing Opposition to Defendants' Motion for Summary Judgment was transmitted by way of this Court's electronic filing system and posted sent by first-class, postage prepaid mail, to the following:

Cynthia G. Peltzman, Assistant County Solicitor
Louis P. Ruzzi, Assistant County Solicitor
Howard County Office of Law
3450 Court House Drive
Ellicott City, Maryland 21043

_____ - s- _____
Anton L. Iamele