IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TYRAN DOBBS | * | |
|    Plaintiff, | * | Civil Action No. RDB-18-0339 |
| v. | * | |
| THOMAS TOWNSEND, *et. al.*, | * | |
|    Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**<u>MEMORANDUM OPINION</u>**

Plaintiff Tyran Dobbs ("Dobbs") brought a four-count Complaint against Defendant Sgt. Thomas Townsend ("Sgt. Townsend"), PFC Michael Pickett ("PFC Pickett"), PFC James Tippett ("PFC Tippett"), and PFC Brian Reger ("PFC Reger"), (collectively, the "Defendants"), asserting claims under 42 U.S.C. § 1983, Article 24 of the Maryland Declaration of Human Rights, and Maryland common law. (Compl., ECF No. 1.) Specifically, Dobbs alleges that the Defendants, officers of the Howard County Maryland Police Department, used excessive force against him that constitutes a violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution, the Maryland State Declaration of Rights, and also constitutes the common law tort of battery. (*Id.*) Dobbs further alleges that the Defendants falsely imprisoned him. (*Id.*) Now pending before this Court is Defendants' Motion for Summary Judgment (ECF No. 21). The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, this Court has determined that Defendants' use of force was objectively

reasonable, Defendants are entitled to qualified immunity, Defendants' Motion shall be GRANTED, and Judgment shall be entered in favor of the Defendants in this case.

## BACKGROUND

The relevant events in this case were triggered by a tactic known as "swatting," which is "the act of placing a 911 call 'in which a false report of a violent crime is made to elicit a police Special Weapons and Tactics squad ("SWAT") response to the physical address of a targeted individual . . . .'", *Kimberlin v. Nat'l Bloggers Club*, No. GJH–13–3059, 2015 WL 1242763 at *1, n.1 (D. Md., Mar. 17, 2015) (citations omitted). In this case, a call was placed to the Maryland Coordination and Analysis Center's Terrorism Hotline (the "Hotline") by an individual purporting to be "Tyrone," stating "that he had a loaded gun, several bags of plastic explosives, and had taken three hostages." (Mot. Ex. 1, Stip. Facts 2, ECF No. 21-3.)[1] The caller then demanded cash to be delivered to the specific address and apartment where Dobbs lived. (*Id.*) The caller then threatened to start killing hostages if his demands were not met within 15 minutes. (*Id.*) The call was placed on February 18, 2015 at about 4:00 p.m. (*Id.*)

The Hotline contacted the Howard County Police Department, indicating that a caller with a British accent, identifying himself as "Tyrone" had made specific threats, including execution of three hostages unless $15,000 was delivered to the address provided. (*Id.*; Mot. Ex. 2, Police Report 2, ECF No. 21-4.) Patrol officers were dispatched to the designated address, where they set up a perimeter, while other officers collected intelligence such as the identity of the residents and criminal histories. (Mot. Mem. 4, ECF No. 21-1 (citing Mot. Exs.

---

[1] The call was initiated by someone seeking revenge for a friend who had allegedly been assaulted a few days earlier over a $50 drug debt owed to Dobbs. (Mot. Ex. 1, Stip. Facts 1, ECF No. 21-3.)

3, 17).) Police records revealed that Tyran Dobbs lived at that address, and he had a history of drug use and resisting arrest. (Mot. Ex. 3, Police Report 6, ECF No. 21-5.)

By about 4:50 p.m., a request was made for the Tactical Section and Negotiators. (*Id.*) The tactical team members received text messages on their cellular phones alerting them of the hostage situation, and as the team began to arrive, they were sent to Dobb's apartment building where one team began evacuating residents from neighboring apartments around 6:00 p.m. (*Id.* at 5.) A second team[2] was stationed near the rear of the apartment with a Bearcat armored vehicle, where they had a view of the back patio and sliding glass door. (*Id.*) They observed someone matching Dobbs' description crawling around on the floor of the apartment and reported seeing a young girl playing on an electronic device. (*Id.*) There was also a team stationed in the next-door apartment, and a second Bearcat armored vehicle was set up at the front of the building illuminating the windows. (*Id.* at 7.) The Mobile Command Post was positioned in the parking lot of the Asian Marketplace, about a quarter of a mile away and out of sight. (*Id.* at 6-7.)

An interview with Dobbs' father revealed that there were likely three people in the residence with Dobbs, and there was a shotgun inside the residence. (*Id.* at 5.) Dobbs' father was unaware of a handgun or explosives inside the residence but could not be certain. (*Id.*) By about 6:20 p.m., the negotiators were able to get a telephone number and called a female who had been seen inside the residence. (*Id.*) She stated: "I know why you are here" and

---

[2] This team was comprised of the four individual Defendants – Sgt. Townsend, PFC Tippett, PFC Reger, and PFC Pickett, and two counter-snipers. (Mot. Mem. 5, ECF No. 21-1.) Sgt. Townsend was the team leader handling communications by radio with other team leaders. (*Id.* at 6.) PFC Reger provided "lethal" coverage with a rifle, PFC Pickett carried the "less-lethal" L-6 multi-launcher equipped with baton rounds, and PFC Tippett was designated to physically take Dobbs into custody. (*Id.* at 7.)

3

indicated she would come out of the apartment.³ (*Id.*) A few minutes later, she and the young girl exited the residence through the sliding glass door, where she confirmed that there was a third female in the back bedroom. (*Id.*) According to the police report, she advised that she did not believe there were explosives but was not sure about guns. (*Id.*)

Attempts to contact the third female in the residence were unsuccessful, but the officers learned that she had failed to show up for work at 5:00 p.m. (*Id.* at 5-6.) Dobbs was contacted at 6:42 p.m. by cell phone and negotiations began. (*Id.* at 6.) Dobbs testified that he and his girlfriend had been sleeping, he got up to find clothes to put on, he told his girlfriend to get up and get dressed, and he told the negotiator that he would come out. (Pl.'s Resp. Ex. 16, Dobbs' Dep. 38, ECF No. 24-16.) Dobbs came to the door but did not come out or put up his hands. (Mot. Ex. 3, Police Report 6, ECF No. 21-5.) The officers had not seen and did not know the status of the third female in the apartment. (*Id.*) At 6:46 p.m., Dobbs came back to the door but did not obey commands from the police officers. (*Id.*) A neighbor provided eye-witness testimony, confirming that Dobbs came out on the patio, put his hands up but then reentered the apartment, and the second time he came out, Dobbs did not keep his hands up as ordered. (Mot. Ex. 5, Morgan Aff., ECF No. 21-7.) Dobbs had one hand on the phone and the other under his shirt at his waist band and began to go back into the apartment. (Mot. Ex. 3, Police Report 6, ECF No. 21-5.) At this point, PFC Pickett deployed a 37mm baton round, i.e., a rubber bullet, at Dobbs to prevent him from reentering the apartment. (*Id.*) It hit Dobbs in his torso, and as he reacted, a second round hit him in the

---

³ She later testified that she thought the police were there because of Dobbs' drug use. (Mot. Ex. 18, Ballew Dep. 32, ECF No. 21-20.)

4

face.[4] (*Id.*) The team moved in and took Dobbs into custody,[5] and Dobbs' girlfriend was found unharmed in the bedroom. (*Id.*) Dobbs was treated by the Tactical Medic at the scene and was transported by ambulance to University of Maryland Shock Trauma. (*Id.*)

Dobbs filed the instant lawsuit on February 2, 2018, almost three years after this incident, alleging that Defendants should have known that they were not responding to a hostage situation before they used force. (Compl., ECF No. 1.) Dobbs brings four claims against all Defendants:

- Count I – Battery
- Count II – False Imprisonment
- Count III – Violation of 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
- Count IV – Violation of Maryland State Declaration of Rights

On November 27, 2018, Defendants filed the pending motion for summary judgment, which is fully briefed and ripe for decision. For the following reasons, this Court holds that under the circumstances, Defendants' use of force was objectively reasonable, Defendants are entitled to qualified immunity, Defendants' Motion for Summary Judgment (ECF No. 21) shall be GRANTED, and Judgment shall be entered in favor of the Defendants in this case.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

---

[4] According to Dobbs, he was first hit in the face, and then in the torso. (Pl.'s Resp. Ex. 16, Dobbs' Dep. 50, ECF No. 24-16.)
[5] Dobbs had flex-cuffs placed on his wrists and the officer performed a pat-down for weapons. (Reply Ex. 5, Tippett Dep. 86-88, ECF No. 27-6.)

5

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 572 U.S. 650, 656-59 (2014).

To survive summary judgment, a party responding to a motion for summary judgment must "do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). It must submit evidence that is "significantly probative" to survive summary judgment. *Anderson*, 477 U.S. at 249-50.

**ANALYSIS**

At the outset, Dobbs concedes that PFC Brian Reger should not be a party defendant in this action and can be dismissed. (Pl.'s Resp. 1 n.1, ECF No. 24.) Dobbs acknowledges that he learned during discovery that PFC Reger had not physically participated in his arrest. With regards to the remaining Defendants, Dobbs contends that there are disputes of fact that preclude summary judgment and that Defendants are not entitled to qualified immunity on Dobbs' Fourth Amendment excessive force claim. (*Id.* at 1-2.)

**I.      Use of Force was Objectively Reasonable**

The law surrounding excessive use of force during arrest is well defined. Claims for the use of excessive force in effectuating an arrest or other seizure are governed by the Fourth Amendment's prohibition against unreasonable seizures, and claims of post-arrest excessive force against an arrestee or pretrial detainee are governed by the Due Process Clause of the Fourteenth Amendment, which prohibits before conviction the use of excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). The same standard is applied when analyzing the appropriateness of a use of force under both the Fourth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011); *Beall v. Holloway-Johnson*, 130 A.3d 406, 417-18 (Md. 2016).

As the right to stop or arrest necessarily involves the right to use some degree of physical force, "[t]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396. "In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed," *Henry*, 652 F.3d at 531 (citing *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)), and "upon the information the officers had when the conduct occurred," *Saucier v. Katz*, 533 U.S. 194, 207 (2001). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).

This Court analyzes several factors to determine objective reasonableness, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The extent of the plaintiff's injury is also a relevant consideration." *Bailey v. Kennedy*, 349 F.3d 731, 743 (4th Cir. 2003) (quoting *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003)). "To properly consider the reasonableness of the force employed we must 'view it in full context, with an eye toward the proportionality of the force in light of all the circumstances.'" *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2005)). At the summary judgment stage, once the evidence is viewed in the light most favorable to the nonmovant, "the question of whether the officer's actions were reasonable is a question of pure law." *Henry*, 652 F.3d at 531 (citing *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007)).

In this case, Dobbs argues that when PFC Pickett deployed the baton rounds, the police officers had enough information to have realized that there was not a hostage situation and that he was fully cooperating with the negotiator on the cell phone. (*See* Pl.'s Resp. 3, 11, ECF No. 24.) However, Dobbs' arguments are not based on the information that the Defendant officers had at that moment in time, but rather on the much more complete picture that is now available but not known to the officers at that time. Focusing on the information available at the moment the force was deployed presents a different picture:

- Sgt. Townsend, PFC Pickett, and PFC Tippett were not privy to any of the conjecture that the situation may have been triggered by a swatting call. (*See* Reply Ex. 1, Baker Dep. 65-67, ECF No. 27-2; Reply Ex 4, Townsend Dep. 158, 202-204, ECF No. 27-5.) Nor were they aware that the caller had a British accent or that a partial phone number indicated it was from Las Vegas. (Reply Ex. 4, Townsend Dep. 62-63, ECF No. 27-5; Reply Ex. 6, Pickett Dep. 42, ECF No. 27-7.) The threat was sufficiently credible that other residents were evacuated from the surrounding apartments. (Mot. Ex. 3, Police Report 5, ECF No. 21-5; Mot. Ex 11, Townsend Dep. 107, ECF No. 21-13.)

- PFC Tippett testified that they were advised that there was at least one hostage, a threat of explosives, a firearm, a threat to harm the hostage, and a deadline for money to be delivered. (Reply Ex. 5, Tippett Dep. 38-39, ECF No. 27-6.) He also testified that based on the information they had, "[t]here's potential that there's a hostage situation in the apartment . . . there's also potential that it's a fictitious call, but . . . we can't rule that out until we're absolutely certain." (*Id.* at 67). He added that with a hostage situation, they were very concerned about the unknown female inside the apartment, and "every second is monumental." (*Id.* at 47, 107.)

- The release of two of the "hostages" did not change the suspicion of a hostage situation, and there was still a third "hostage" who had not yet been seen. (Reply Ex. 4, Townsend Dep. 125, ECF No. 27-5; Reply Ex 6, Pickett Dep. 93-94, ECF No. 27-7.) The female who exited the apartment told the Defendant officers that there were no explosives, but the officers still believed there may be guns. (Mot. Ex. 2, Police Report 4, ECF No. 21-4; Mot. Ex. 3, Police Report 2, ECF No. 21-5.) Further, there had been confirmation of a shotgun in the closet of one of the bedrooms, although it was claimed that Dobbs did not know about it. (Reply Ex. 8, Ballew Dep. 33, ECF No. 27-9; Reply Ex 9, Thomas Dobbs Dep. 24, 32, ECF No. 27-10.)

9

- The officers were not sure if Dobbs was armed. (Reply Ex. 5, Tippett Dep. 74-75, ECF No. 27-6.) He was observed with his hand under his shirt at his waistband and not visible. (Reply Ex. 4, Townsend Dep. 133, 142, ECF No. 27-5; Reply Ex. 5, Tippet Dep. 85, ECF No. 27-6; Reply Ex. 6, Pickett Dep. 77-78, ECF No. 27-7; Reply Ex. 7, Garroway Dep. 87, ECF No. 27-8.)

- PFC Tippett testified that each time Dobbs came to the sliding glass door and retreated caused heightened concern, particularly since they had been advised that Dobbs had agreed to come out, but he had not done so and had not obeyed the officers' verbal commands. (Reply Ex. 5, Tippett Dep. 77, 86, 90-91, ECF No. 27-6.) The officers perceived an "elevated risk" of a "potential that an innocent person is being harmed right now." (*Id.* at 107.)

- Sgt. Townsend testified that he instructed PFC Pickett to deploy the L-6 "less-lethal" rounds to prevent Dobbs from going back into the apartment because "[a]nything can change from him becoming agitated because of our presence there to go in and harm the hostage . . . ." (Reply Ex. 4, Townsend Dep. 144, ECF No. 27-5.) PFC Pickett testified that they were concerned that Dobbs "was getting more and more agitated, and we were scared that if he went back in, that he could hurt her, himself, or something." (Reply Ex. 6, Pickett Dep. 73-74, ECF No. 27-7.)

- The Defendant officers were not aware of the actual conversation between Dobbs and the hostage negotiator or that he sounded sleepy and cooperative. (Reply Ex. 4, Townsend Dep. 26-27, 29-30, 128-29, ECF No. 27-5; Reply Ex. 6, Pickett Dep. 113, ECF No. 27-7.) They were advised only that Dobbs had agreed to go outside, they did not know why Dobbs appeared and went back inside, and their interaction with Dobbs was that he refused to comply with their verbal commands. (Reply Ex. 4, Townsend Dep. 130-33, 138, 140-41, ECF No. 27-5; Reply Ex. 5, Tippett Dep. 69, ECF No. 27-6; Reply Ex. 6, Pickett Dep. 69-74, ECF No. 27-7.) PFC Pickett testified that before he fired the L-6, it looked like Dobbs was not going to comply just as he had not before. (Reply Ex. 6, Pickett 77, ECF No. 27-7.)

Considering the severity of the hostage threat, the threat to the safety of officers or others, the appearance of Dobbs retreating while not obeying verbal orders, it was objectively reasonable for the officers to employ a proportionate force—less lethal baton rounds aimed to prevent Dobbs from returning into the apartment rather than lethal force. Further, a reasonable officer would be expected to secure and restrain the suspect under the circumstances. Learning in hindsight that Dobbs was unarmed, and that there was no actual

threat, does not change the reasonably perceived threat at the time that the officers were required to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. The Fourth Circuit has consistently held that an officer does not have to wait for confirmation before being entitled to use force. *See, e.g.*, *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) (holding that the officer was entitled to use deadly force when the officer had reason to believe the suspect was armed, although the officer could not confirm that the suspect was armed); *Slattery v. Rizzo*, 939 F.2d 213, 215-16 (4th Cir. 1991) (holding that deadly force was appropriate when the suspect failed to comply with the officer's order to raise his hands and the officer reasonably believed the suspect to be coming at him with a weapon, although the "weapon" turned out to be a beer bottle). In light of the circumstances, it is extremely fortunate that no one was killed as a result of the "swatting" call. However, Defendants' use of force, under the circumstances at the time, was objectively reasonable, and they are entitled to summary judgment on the use of force claims.

## II.  Defendants are Entitled to Qualified Immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The defense provides protection for

public officials for mistakes of law, mistakes of fact, or a combination of the two. *See Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting).

In order to determine if a public official is entitled to the protections afforded by qualified immunity, two inquiries must be addressed by this Court. Although the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, directed a rigid approach to the inquiries involved, the requirement that the two-prong analysis must be "considered in proper sequence" has since been revised. *Id.* at 200. Courts are now "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 818.

The first prong is whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. If the evidence establishes a violation of a constitutional right, the second prong is to assess whether the right was "clearly established" at the time of the events at issue. *Id.* If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability. The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Henry*, 501 F.3d at 377-78 (citing *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003)).

Therefore, to determine if the Defendants are entitled to qualified immunity on the Fourth Amendment excessive force claim, this Court must examine whether the use of the baton rounds violated Dobbs' Fourth Amendment rights, and if so, whether the right was

12

clearly established at that time. *See id.* As reasoned above, this Court has determined that Dobbs' Fourth Amendment rights were not violated by the officers' use of force. However, even if this Court found that the use of the baton rounds under the circumstances was excessive and a violation of the Fourth Amendment, this is not a case where it is obvious that there was a violation of clearly established law. There is no jurisprudence with respect to the use of baton rounds in a situation such as presented in this case.

Certainly, a case directly on point is not required for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. —, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. —, 136 S. Ct. 305, 308 (2015)). "[I]mmunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (citations omitted). In 2016, the Fourth Circuit analyzed the use of an electric stun gun, or taser, which is also a "less-lethal" weapon used to take a suspect into custody. *See Armstrong v. Village of Pinehurst*, 810 F.3d 892, 903 (4th Cir. 2016). In *Armstrong*, which was decided almost a year after the events at issue, the Fourth Circuit held that a taser "may only be deployed when a police officer is confronted with an exigency that creates an immediate safety risk," but not "in the face of stationary and non-violent resistance to being handcuffed." *Id.* at 909-10. In other words, at the time of the events at issue, it was not clearly established that the use of a less-lethal but serious use of force that could cause pain or injury to a person who was not actively resisting arrest would constitute excessive force.

Accordingly, this Court holds that the Defendants are entitled to qualified immunity.

**III.   State Law Claims**

Dobbs also claims that Defendants are liable for battery and false imprisonment. Under Maryland law, "[a]n officer is not liable for battery for using a reasonable amount of force when effectuating a lawful detention or arrest." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (citing *Ashton v. Brown*, 660 A.2d 447, 471 n.24 (Md. 1995)). However, an officer may be held liable for battery if the officer "uses excessive force, or force greater than is reasonably necessary under the circumstances." *French v. Hines*, 957 A.2d 1000, 1037 (Md. Ct. Spec. App. 2008) (quoting 6A C.J.S. Assault § 35 (2008 Supp.)).  As discussed above, this Court has determined that under the circumstances of this case, the Defendants were justified in their use of force.  Therefore, Defendants shall be granted summary judgment on the battery claim.

With regards to false imprisonment, a police officer carrying out an arrest with legal authority or justification under the circumstances is not liable for false imprisonment in connection with that arrest. *Montgomery Ward v. Wilson*, 664 A.2d 916, 926 (Md. 1995).  As reasoned above, the Defendants had legal justification for their actions under the circumstances of this case.  Therefore, they shall also be granted summary judgment on the false imprisonment claim.

## CONCLUSION

For the foregoing reasons:

1. Defendants' Motion for Summary Judgment (ECF No. 21) is GRANTED, and Judgment shall be entered in favor of the Defendants.
2. A separate Order follows.

Date: September 19, 2019.

\_\_\_\_\_/s/_____
Richard D. Bennett
United States District Judge